# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| EUNICE CAMPBELL, | ) |
| | ) |
| Plaintiff, | ) |
| | )　　CIVIL ACTION |
| v. | ) |
| | )　　No. 04-2416-CM |
| | ) |
| GAMBRO HEALTHCARE, INC., | ) |
| | ) |
| Defendant. | ) |
| ——————————————————— | ) |

## MEMORANDUM AND ORDER

This is an employment case arising under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and 42 U.S.C. § 1981.  Plaintiff Eunice Campbell asserts three theories of recovery against defendant Gambro Healthcare, Inc.:  (1) interference with plaintiff's rights under the FMLA; (2) retaliation against plaintiff for exercising her FMLA rights, and (3) race discrimination in violation of § 1981.  This matter comes before the court on defendant's Motion for Summary Judgment (Doc. 46).  For the reasons set forth below, the court grants defendant's Motion in its entirety.

## I.　　Facts[1]

### A.　　Defendant's Structure

Defendant is headquartered in Denver, Colorado, and provides healthcare services in the area of end-stage renal dialysis and related services.  Defendant is an employer subject to the requirements of the FMLA.

---

[1]The court construes the facts in the light most favorable to plaintiff as the nonmoving party pursuant to Fed. R. Civ. P. 56.

Defendant purchased RMI in 2001, including the Atchison clinic where plaintiff was employed.  The Atchison clinic is open three days a week, for approximately ten to twelve hours per day, for dialysis patient treatment.  The optimal patient census (the number of patients receiving treatment) at the Atchison clinic is approximately twenty-four to twenty-six.  A patient census of twenty-four to twenty-six would require two patient care technicians to work approximately forty hours per week.  In a dialysis clinic, the patient census is always in a state of flux.  The regional director over the Atchison clinic during plaintiff's employment was Richard Pedrick.  The center director for the Atchison clinic during plaintiff's employment was Ilene Dwyer.  Pedrick testified that center directors generally had responsibility for employee back-up, as part of their general responsibility for staffing the clinic, including drawing upon defendant's employees from another clinic.

### B.      Plaintiff's Employment

Plaintiff, a black female, began her employment with defendant on April 1, 2001.  Throughout her employment with defendant, plaintiff acknowledged she was an at-will employee.  While employed by defendant, plaintiff worked exclusively at the Atchison clinic.

Defendant hired plaintiff as a patient care technician ("PCT").  A PCT performs assigned patient care responsibilities under the direct supervision of a registered nurse and in accordance with defendant's policies, procedures and guidelines, federal statutes such as OSHA, HCFA, AAMI, and federal, state and local regulations.

The duties of a PCT include setting up, operating, cleaning and disinfecting dialysis and related equipment in accordance with policies and procedures as well as monitoring equipment and patient status during dialysis treatments.  A PCT also obtains vital signs and appropriate data, initiates treatment, prepares,

administers and records medications, documents and communicates patient status to nurse, reports changes in patient condition, documents treatment information, maintains confidentiality, participates in emergency care, participates in the QA/CQI process, maintains cleanliness in the area, participates in team care, assists other staff in performance of their duties, and performs other positions as needed, including reuse technician, inventory technician and unit secretary.

Plaintiff was promoted to PCT II effective June 15, 2002.  The duties of a PCT II are the same as a PCT I; the distinction reflects a raise in pay.  It is uncontroverted that plaintiff was considered to be an exemplary PCT who demonstrated an excellent commitment to the organization, tackled assignments with creativity, had a value-added questioning nature, had a sense of urgency and was considered an expert at her level.  In addition to her role as a PCT II, plaintiff also was responsible for the duties of inventory technician and unit secretary within the Atchison clinic.  Plaintiff contends that Dwyer assisted plaintiff with the unit secretary duties.

An inventory technician is responsible for maintaining the clinic's inventory, inventory records, logs, files, manual purchase orders and ensuring appropriate levels of supplies, medications and equipment are available at all times using the automated physical inventory computer system ("PICS").  An inventory technician also is responsible for maintaining inventory on a first in/first out basis, ensuring that supplies do not expire before usage, and recording inventory receipts, issues and transfers on a timely basis.  An inventory technician is to count the quantity of inventory on the shelf for each item and write that number on the count sheet, which is then entered into the PICS.  Additionally, an inventory technician is responsible for printing and reviewing audit trail reports on a daily, weekly and monthly basis and communicating and reviewing the reports with the center director.  Defendant sent plaintiff to its one-week inventory technician

training course in Brentwood, Tennessee in November 2001.  Plaintiff completed the PICS inventory training course on November 29, 2001.

The unit secretary performs a variety of clerical and administrative duties associated with facility operations.  The unit secretary's responsibilities include assembling and preparing new patients' charts, keeping accurate patient records (including copying Medicaid and Medicare cards every month and verifying that the cards are up to date), filing patient data, purging and archiving patient information, calling clients who are late for appointments, and file and send out the mail.  Defendant sent plaintiff to its one-week unit secretary training course in Florida.

Each year that plaintiff and Dwyer worked together, Dwyer had to fill out annual evaluations of plaintiff, which covered all of her duties as PCT, unit secretary, and inventory clerk.  On each evaluation Dwyer rated plaintiff in all areas of the evaluation as either average or above average.  In the annual evaluation for 2002, Dwyer rated plaintiff as having "outstanding competency" in the handling of inventory.

From February 2001 to January 2004, the Atchison clinic employed two PCTs: plaintiff and Pat Jackson, another black female.  Both plaintiff and Jackson had been employed as PCTs (Jackson as a PCT I and plaintiff as a PCT II) at the Atchison clinic since August 31, 1999.  The record reflects that, for benefits purposes, plaintiff and Jackson had the same seniority date with defendant because their hire dates were based on the date that defendant bought the Atchison clinic – both plaintiff and Jackson were working at the clinic when defendant bought it.  However, Jackson had more experience in the PCT position than plaintiff.  Both defendant and plaintiff recognize that Jackson was more experienced in her work as a PCT, even though Jackson and plaintiff had the same technical seniority dates with defendant.  Prior to plaintiff taking FMLA leave, Jackson had taken FMLA leave with no adverse employment action as a result.

### C.      Defendant's Attendance/Absentee Policy

Defendant's attendance policy allows each clinic to establish its own local call-in practice and procedure, by which employees of a clinic are supposed to advise defendant when they are going to be absent.  Defendant contends that the policy for calling in sick at the Atchison Clinic is to notify the center director directly at least one hour in advance of any unexpected absence so that alternate staffing arrangements could be made.  Pedrick testified that he has no knowledge of any local policy for notification specifically used at the Atchison clinic.  Plaintiff contends that the Atchison clinic had its own local call-in practice of having an employee call the other PCT and then the center director.

If the center director is absent or on vacation, and in the event that the center director is unavailable via cellular phone, a center director from a nearby clinic is assigned as the designated supervisor for calling about being absent.  Defendant contends that the employees at the Atchison clinic all knew that Dwyer was available by cell phone when she was away from the clinic.

Under defendant's attendance policy, an unscheduled absence equals one occurrence point.  Under defendant's progressive discipline policy, it typically takes three occurrence points to necessitate the issuance of a corrective action form, or there must be a failure to follow the local call-in practice.  However, defendant's progressive discipline policy also provides that the failure of an employee to notify her manager of an absence within one hour of scheduled start time or per local call-in practice, even if the time off is covered with paid time for compensation purposes, may result in corrective action up to and including termination of employment, regardless of the number of occurrence points accumulated.

### D.      Cutbacks at the Atchison Clinic

Beginning in approximately May 2003, the patient census at the Atchison clinic began to significantly decline. By July 2003, the patient census at the Atchison clinic was only thirteen.[2] The available work hours for PCTs decline as patient census declines; thus, as a result of the decreased patient census in 2003, the hours for the PCTs at the Atchison clinic were reduced. Continuing to operate the Atchison clinic in July 2003 with the staffing in place greatly affected its profitability to the extent that closing the Atchison clinic altogether was discussed.

Defendant contends that the only business strategy under the circumstances to keep the Atchison clinic open was to reduce staffing. Defendant contends that, in July 2003, it determined that it might be necessary to lay off one of the PCTs, unless one of the PCTs would work part-time at another clinic. Pedrick testified that one of the options for handling the dwindling patient census at the Atchison clinic was to lay off one of the patient care technicians. The record is unclear whether Pedrick discussed the possibility of a lay off with either plaintiff or Jackson. Plaintiff contends that the only options discussed in fall 2003 were either to reduce the hours of the current staff or to have the current staff pick up hours at another clinic.

In early August 2003, Pedrick, Dwyer, Jackson and plaintiff met to discuss the dwindling patient census. During this meeting, Jackson and plaintiff were advised of the necessary reduction in available hours due to patient census and were offered the opportunity to supplement hours by working at defendant's St. Joseph or Platte Woods clinics. Neither Jackson nor plaintiff took advantage of the opportunity to supplement hours at other nearby clinics. Defendant contends that plaintiff remained silent regarding a

---

[2] During her deposition, Dwyer estimated the patient census in late summer or early fall 2003 to be between ten and fifteen, but could not recall the exact number.

reduced hour option or a transfer.  Plaintiff contends that both she and Jackson elected to reduce their hours

rather than pick up hours at another clinic.

      **E.**      **Plaintiff's Back Injury and Subsequent FMLA Leave**

      Plaintiff has suffered from spinal spondylolisthesis, a degenerative back ailment, since at least April

2002.  Plaintiff first sought treatment for this ailment from Dr. Robert M. Drisko, a doctor referred to her by

Dwyer, on April 30, 2002.  Between April 30, 2002 and October 15, 2003, plaintiff sought treatment from

Dr. Drisko on eight occasions – April 30, 2002, May 7, 2002, June 11, 2002, June 25, 2002, June 24,

2002, September 2, 2003, September 30, 2003 and October 15, 2003.

      On or about October 9, 2003, Dwyer went on vacation.  During Dwyer's absence, Ruby

Thompson, the center director for defendant's St. Joseph clinic, acted as the center director in charge of the

Atchison clinic.

      On October 12, 2003 at approximately 11:00 p.m., plaintiff fell in her home, injuring her back.

Plaintiff was walking down the stairs of her residence when she slipped on the last two stairs, fell forward, hit

the doorway with her shoulder, then smashed her knee on the floor, before coming to rest lying on her side.

Plaintiff claims that she called her co-worker, Jackson, at about 11:30 that night to advise Jackson that she

was not going to be able to work on her next scheduled work shift, October 13, 2003.  Plaintiff did not

contact Dwyer on her cell phone to let Dwyer know that she was going to be absent.  Plaintiff did not show

up for work on October 13, 2003.

      Defendant contends that plaintiff did not notify Dwyer or Thompson, the acting center director, at

any time prior to her shift on October 13, 2003, that she would not be coming into work, which was a

violation of defendant's attendance policy.  During her deposition, plaintiff claimed that she left a message at

the St. Joseph clinic to advise Thompson that plaintiff would be absent and unable to come to work on

October 13, 2003.  Plaintiff testified that she then had her daughter take her to the Atchison clinic so that

plaintiff could send an e-mail to Thompson advising her that plaintiff would be absent and unable to come to

work on October 13th.  Plaintiff further claims that she "text messaged" Thompson on October 13th to let

her know that she would not be at work.  Plaintiff had never sent Thompson a text message before, and

there is no record that Thompson ever received the message or that Thompson's phone could even accept

text messages.  The record reflects that Thompson did not receive a message or a phone call from plaintiff

prior to the start of plaintiff's October 13, 2003 shift.[3]  Defendant issued plaintiff a corrective action form on

January 5, 2004, in part for plaintiff's failure to follow defendant's policy and notify a center director in

advance of her October 13, 2003 absence.

Plaintiff visited Dr. Drisko on October 15, 2003, at which time Dr. Drisko advised plaintiff to have

surgery on her back.  Plaintiff's back surgery was scheduled for November 10, 2003.  Plaintiff applied and

was approved for FMLA leave dating from October 13, 2003 through January 5, 2004.  During plaintiff's

leave, defendant had Gaylene Caples, who worked at defendant's St. Joseph clinic, handle the inventory

technician duties. Cindy Keling, who also worked at defendant's St. Joseph clinic, handled the unit secretary

duties during plaintiff's absence.

Initially, Dwyer told Pedrick that she was angry that plaintiff took time off while she was away from

the clinic on vacation.  Dwyer was concerned that she could not depend on plaintiff while she was on

---

[3] Plaintiff's deposition testimony surrounding the date of her back injury in October 2003 and the steps she took to notify a center director of her subsequent absence, compared to the record of her days worked and the actual notice that Thompson received, is somewhat contradictory and confusing. Accordingly, the court, having compared plaintiff's testimony and the rest of the record, has sorted out the facts as clearly as possible for the purposes of this Order.

vacation, and that plaintiff would take time off whenever she wanted, regardless of Dwyer's vacation plans. Dwyer felt that plaintiff's unplanned absence left the clinic in disarray because Dwyer was also away from the clinic.  However, at the time that Dwyer initially became angry about the circumstances, Dwyer was unaware that plaintiff had injured her back and taken FMLA leave to have surgery.  When Dwyer provided plaintiff's address to defendant's human resources department so that it could send plaintiff a "leave packet," Dwyer noted that she hoped plaintiff would not be gone until Dwyer could return from vacation, but that Dwyer should be used to this kind of activity.  Dwyer was concerned that things would not run well in the unit if plaintiff was on FMLA leave at the same time Dwyer was on vacation.  However, Dwyer testified that she did not feel that it was wrong for plaintiff to go ahead with her back surgery even though Dwyer was on vacation at the time.

**F.      Coverage of the Unit Secretary and Inventory Technician Duties During Plaintiff's Leave**

Defendant contends that, during plaintiff's leave, it discovered that plaintiff failed significantly in both her unit secretary and inventory technician duties.  First, defendant claims that, upon reviewing the Atchison clinic inventory, Caples discovered that plaintiff had failed to follow company policy for conducting inventory.  Specifically, while performing the inventory technician tasks in October 2003, Caples discovered nearly $6,500 worth of inventory that was listed in the PICS system inventory but that had no corresponding product items on the shelves.

Defendant's policy mandates that an inventory be done each week and a physical inventory be conducted each month at every clinic.  The inventory is to be conducted by the inventory technician.  The inventory technician is to count the quantity of inventory on the shelf for each item and write that number on the count sheet.  Next, the inventory technician enters the item number and quantity into the PICS system.

Once the item type and quantity are entered, the PICS system automatically calculates the clinic's usage and supply expense. Inventory items that are transferred to another clinic or items that have been returned or have been rendered obsolete must be accounted for in the PICS system. Defendant's policy requires that inventory technicians process adjustments, returns to vendors or transfers in every case whenever supplies are removed from the clinic.

Plaintiff contends that she did not mishandle any inventory and that she followed the policies of the Atchison clinic. Plaintiff contends that when an item was no longer in use, plaintiff and Dwyer would see if another clinic could use it and would then transfer the item to the other clinic. Plaintiff contends that, once she returned from her FMLA leave, she was also able to explain where she thought the missing inventory items were.[4] However, as defendant points out, plaintiff's failure was in not accounting for the items in the PICS system. Defendant contends that plaintiff's own inventory lists showed numerous items that were not on the shelf at the Atchison clinic when Caples conducted inventory in October 2003, but which remained on the inventory list. It is undisputed that this could only be the result of plaintiff's failure to properly update the inventory at the time it was removed from the Atchison clinic – whether or not she could later account for the location of the inventory. Plaintiff did not provide any reason for her poor record keeping and why the items were left on the inventory after they were no longer at the Atchison clinic.

Defendant contends that plaintiff had numerous opportunities while performing periodic inventory counts over several months prior to her FMLA leave to make proper accounting entries to transfer, return or dispose of supplies that were obsolete. Instead, plaintiff continued to carry these items worth more than $6,500 as inventory assets when, in fact, they had been taken out of stock. As a result, the Atchison clinic

---

[4] Defendant contends that plaintiff accounted for about only half of the missing inventory items.

had to enter a supply expense of $6,500 for October 2003, which increased the supply expense per treatment cost and significantly contributed to a total $9,455.68 loss for the Atchison clinic in October 2003. Defendant contends that this is a significant loss for a clinic the size of the Atchison clinic. Defendant considered the inventory errors a result of plaintiff's failure to properly perform her inventory technician duties and considered the failure in her duties a terminable offense. Based on plaintiff's performance failures with respect to her inventory technician duties, Pedrick determined that plaintiff was no longer qualified to handle these tasks, pending the results of an investigation into the matter and an explanation by plaintiff of where the unaccounted for inventory items were. It is undisputed that the inventory problems were due to poor recording keeping by plaintiff and not theft. Although defendant considered plaintiff's performance of the inventory duties a basis upon which it could have terminated her employment, a decision to terminate her employment was not made at that time.

Defendant's second discovery centered on plaintiff's unit secretary duties. Specifically, in October 2003, while handling the unit secretary duties during plaintiff's leave, Keling reported a concern to her center director, Thompson, that she had discovered several thousand sheets of old patient records that had been purged from active charts and allowed to pile up on shelves in plaintiff's back office. Defendant's policy requires a monthly purging of charts and prompt filing of purged records into inactive files stored in locked file cabinets or file boxes, sorted by patient and kept at the clinic or at an off-site storage area.

Keling was shocked at the sheer volume of the backlogged files created by plaintiff's failure over some period of time to purge these files and comply with defendant's policy regarding these records. Keling worked overtime to ensure that the Atchison clinic was within compliance with state and federal regulations. It took Keling nearly two months to properly prepare and archive the backlog of records.

-11-

Plaintiff acknowledges that there was some backlog in the files, but contends that the responsibility was also Dwyer's. Specifically, plaintiff admitted that she had been trying to get the patient charts updated, but that other tasks prevented her from making the updated filing of the patient charts a priority. Dwyer had offered her assistance to plaintiff in archiving old files in order to help get the files up to date.

Based upon plaintiff's performance failures with respect to her unit secretary duties, Pedrick determined at that time that plaintiff was no longer qualified to handle these tasks. Plaintiff denies that there were any performance failures and contends that she performed all aspects of her duties satisfactorily.

On December 26, 2003, when plaintiff was preparing to be released from FMLA leave, she sent an e-mail to Thompson and copied Pedrick, indicating her desire to try to supplement her hours at the St. Joseph clinic. Pedrick responded via e-mail by stating, "NOT a good option in my opinion."

**G.     Plaintiff's Return from FMLA Leave**

Plaintiff timely returned from FMLA leave on January 5, 2004. Plaintiff's hourly compensation and benefits on January 5, 2004, were the same as when she took leave on October 13, 2003, although both her work hours and Jackson's work hours had been reduced to part-time status as a result of the low patient census.[5] Defendant contends that plaintiff's status as a PCT II, seniority and privileges of employment were also the same as when she took leave on October 13, 2003, and the same that she would have had if she had not taken leave. Further, despite the fact that neither she nor Jackson was working full-time hours at that point, defendant contends that plaintiff returned to working the same hours she would have

---

[5] During her deposition, Dwyer estimated that the patient census in January 2004 was between ten and fifteen but could not recall the exact number.

been working even if she had not taken leave due to the low patient census.[6]  However, plaintiff was relieved of her unit secretary and inventory technician duties based on the discoveries defendant made while plaintiff was on leave.  Plaintiff still did some of the filing, but she no longer handled billing.[7]

Plaintiff contends that she was not brought back to an equivalent position after her FMLA leave because her job duties and status had changed.  Specifically, plaintiff contends that when she returned from FMLA leave, she was still termed a PCT, but she did not actually perform any PCT duties.  Instead, Dwyer assigned plaintiff whatever duties Dwyer felt were appropriate at the time. Defendant contends that plaintiff's PCT duties were the same as before her leave, but before resuming those duties she first was asked to address the inventory errors that had been discovered during her leave, specifically the location of the items that were still in the PICS system but not at the Atchison clinic, and to clear out backlogged files.

The day that plaintiff returned to work from FMLA leave, plaintiff went to the Atchison clinic, clocked in, and was immediately called into Dwyer's office and given a corrective action form.  Pedrick, Dwyer and defendant's human resources department discussed the fact that plaintiff would be given a corrective action form for improper absence notification on October 13, 2003.  However, Dwyer did not consult with anyone while drafting the corrective action form itself.  The corrective action form, which was

---

[6] The record reflects that the week immediately prior to taking her FMLA leave, plaintiff worked 23.17 hours.  When plaintiff returned from FMLA leave, she was working approximately 21 hours per week.

[7] Pedrick testified, however, that with some retraining and different supervision, plaintiff could have been an acceptable unit secretary.

prepared by Dwyer and signed by Dwyer, states that the "nature of problem" is "incorrect procedure for

calling in for STD."[8]  The description section of the form states:

> Staff member had been having back problems for several months and had been under
> doctor's care.  She had been off for a few days at a time on other time periods.  She had
> been questioned numerous times regarding the possibly [sic] that she was going to have
> surgery.  Staff members [sic] response was always, no I can't afford to take that much time
> off.  CD was going on vacation and West 4 Regional Meeting on October 10.  I again
> questioned staff member on her back situation.  "No problem" was the response.  I left on
> vacation on the 9th of October.  I have a cell phone that is always on for family or employee
> emergencies.  When I checked my email prior to leaving my vacation spot and going to
> Galveston for the W4 meeting, I discovered several emails telling me that this staff member
> had called the other PCT at home and told her that she wouldn't be back to work due to
> pending back surgery.  The other PCT covered.  The RN covering me was very upset and
> called the CD covering my unit while I was gone.  It was several days before this staff
> member notified that CD and that was to tell her that she needed paper work for STD.  It
> caused a serious situation in the unit due to the other PCT not having any training with
> inventory and unit secretary duties.  The inventory for the Atchison unit will now be covered
> by the Inventory Tech in the St. Joseph Unit #0536.  The billing will be covered by the US,
> also at the St. Joseph unit.  This has caused serious difficulties in the Atchison unit for getting
> everything back up to date following the time span with no one taking care of the filing, etc.

The action plan section of the form states: "[s]taff member will no longer be doing the inventory or Billing

duties in the unit.  Staff member will be instructed as to what duties she will be allowed to do."  Plaintiff

refused to sign the corrective action form, because she claimed that she did call Thompson to inform her of

her absence on October 13, 2003.

        Prior to receiving the January 5, 2004 corrective action form, plaintiff had never been issued any

kind of discipline or corrective action forms.  The January 5, 2004 corrective action form does not state any

problems with plaintiff's performance as the inventory technician or as the unit secretary.  Dwyer testified

that she filed the corrective action form to "save" plaintiff's job.  In an e-mail to Pedrick on January 5, 2004,

---

[8] The term "STD" is not defined on the form; however, based on the context in which it was
written, the court believes STD means short term disability.

Dwyer advised Pedrick that she had issued a corrective action form and that she "hoped that by Friday this is all over and done with."  Dwyer testified that she meant that she hoped a decision would be made by that Friday (January 9) whether plaintiff would accept a transfer, a severance package, or be terminated.  Pedrick testified that it was not defendant's plan as of January 5, 2004, to terminate plaintiff's employment.

Plaintiff wrote Pedrick on January 8, 2004, stating that she felt she was being treated differently, that she had been demoted from a PCT II to a PCT I, and that she had her work hours reduced.  Plaintiff requested a private meeting with Pedrick.

**H.     Elimination of Plaintiff's PCT Position at the Atchison Clinic**

Because the patient census at the Atchison clinic had not improved since July 2003, Pedrick determined as of January 7, 2004, that, in order to mitigate any further loss at the clinic, one of the PCT positions would be eliminated.[9]  Based on a totality of performance evaluation and seniority, Pedrick determined that Jackson would remain as the Atchison clinic's only PCT, despite the fact that plaintiff was a PCT II, while Jackson was a PCT I.

Defendant contends that it wanted to maintain plaintiff's employment as a PCT at a different clinic.  On January 9, 2004, Pedrick and Dwyer met with plaintiff at the Atchison clinic to discuss the inventory issue and the elimination of plaintiff's position at the Atchison clinic.  Pedrick gave plaintiff two options: (1) apply for transfer to a PCT position at another clinic, such as the St. Joseph or Platte Woods clinics, which Pedrick would facilitate if there was a suitable opening; or (2) voluntarily resign, sign a release stating that she would not take legal action against defendant, and receive six weeks of severance pay (covering forty

---

[9] Prior to this time, the Atchison clinic had never laid off any employee or terminated an employee due to patient census.

-15-

hours per week) and benefits.  Pedrick gave plaintiff until the end of January to decide which option to take.

If she did not take either option, her employment would be terminated.

The same day, Pedrick sent plaintiff a written memorandum via e-mail outlining the two options and

noting that, due to the inventory issues that were discovered during her FMLA leave, defendant's human

resources had strongly advised that they terminate plaintiff's employment instead of offering the other

alternatives.[10]  In the memorandum, Pedrick reminded plaintiff that she had until the end of January to make

her decision.

Plaintiff contends, however, that because she had been given a corrective action form on January 5,

2004, she thought that, under defendant's policy, she was prevented from transferring or relocating to

another location for six months.  Pedrick testified that, although defendant's policy prohibited an employee

who had received a corrective action from transferring for six months from the date of the corrective action,

defendant made an exception to the policy in plaintiff's case and offered her the option to transfer anyway.

Pedrick testified that he was in favor of plaintiff transferring to another clinic at that time.

Plaintiff further contends that she thought, under defendant's policies, that severance pay was not

allowed when an employee is terminated for cause, voluntarily resigns, or when defendant has offered a

comparable job.  While defendant agrees that its severance policy generally does not allow for severance

pay in those situations, defendant contends that the policy also states that there may be other circumstances

in which it will negotiate a separation agreement that includes a payment and a release of all claims against

defendant, as it had proposed in plaintiff's case.

---

[10] The memorandum did not reference any issues regarding plaintiff's alleged deficiencies in her unit
secretary duties.

-16-

Plaintiff appears to have believed that she could not transfer because of her January 5, 2004 corrective action, and that any severance package was negated by defendant's severance policy, in light of the offer of a transfer.  Essentially, plaintiff claims that defendant offered her options that she could not take.  However, defendant has asserted that it made an exception to both the corrective action policy and the severance policy in plaintiff's case.  Moreover, it does not appear that plaintiff ever asked whether the transfer option or severance package were really options in light of her understanding of the policies and did not attempt to pursue either option before her employment ended.

On January 14, 2004, Dwyer advised plaintiff that her work hours were being changed to 6:00 a.m. to 1:00 p.m., which defendant claims was due to the low patient census.  Plaintiff had previously worked from 5:00 a.m. to 3:00 p.m.  Plaintiff turned in her keys to Dwyer and asked that Dwyer write out the schedule that plaintiff was to work.  Plaintiff contends that when she handed Dwyer her keys, Dwyer put them in a baggie on her desk and told plaintiff to finish the work day breaking down machines and setting them up.  Dwyer testified that, when plaintiff handed in her keys, Dwyer asked plaintiff to reconsider the transfer offer, but that plaintiff went home instead.  Dwyer also testified that plaintiff told her that she wanted the severance payment but was not going to sign any papers.  Plaintiff testified that she did not believe, nor did she indicate, that she intended to resign when she handed Dwyer her keys on January 14, 2004.  However, Pedrick and Dwyer both testified that they interpreted plaintiff handing in her keys as representing her desire to quit and saw no other reason for plaintiff to turn in her keys.[11]  When plaintiff left on January 14, 2004, she was scheduled to return to work on January 16, 2004.

---

[11] There is no indication in the record that anyone at defendant requested that plaintiff turn in her keys on this day.

-17-

Pedrick testified that, because plaintiff had not accepted the severance package or transfer and had handed in her keys, defendant thought that plaintiff's intent to resign was clear. Thus, when plaintiff worked on January 16, 2004, defendant told plaintiff that it would be her last day. Plaintiff ended her employment without requesting a transfer to another clinic or accepting the severance package. Defendant considered plaintiff to have resigned her employment effective January 16, 2004. Plaintiff contends that her employment was terminated at the end of the day on January 16, 2004, which removed the option of a transfer or a severance package. Dwyer filled out a separation form for plaintiff, which states that plaintiff resigned.

## I.      Performance of Plaintiff's Duties After Her Employment Ended

Since plaintiff's employment ended, the Atchison clinic has been staffed by one registered nurse and one PCT, Jackson. The PCT position formerly held by plaintiff has never been filled, and defendant is not seeking to hire any additional PCTs. Plaintiff's former unit secretary duties are being handled by Sheila Harris, a unit secretary at another of defendant's clinics. Plaintiff's former inventory technician duties are being handled by Rhonda Everett, an inventory technician at another of defendant's clinics. There are no Atchison clinic unit secretary or inventory technician positions. As of May 2005, the patient census at the Atchison clinic was approximately thirteen.[12]

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most

_____

[12] Again, Dwyer testified that the patient census at the time of plaintiff's leave was between ten and fifteen patients but could not recall the exact number.

favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). **III.   Analysis**

      **A.**        **FMLA Claims**

      The FMLA provides in relevant part that "an eligible employee shall be entitled to a total of 12 work

weeks of leave during any 12-month period for one or more of the following: . . . (D) Because of a serious

health condition that makes the employee unable to perform the functions of the position of such employee."

29 U.S.C. § 2612(a)(1)(D).  Section 2615(a) of the FMLA allows two avenues of recovery for an

employer's interference with an employee's FMLA rights.  First, "[i]t shall be unlawful for any employer to

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the

FMLA]."  *Id.* § 2615(a)(1).  Second, "[i]t shall be unlawful for any employer to discharge or in any other

manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  *Id.*

§ 2615(a)(2).  Upon return from FMLA leave, an employee is entitled to keep her previous employment

position or be given an equivalent position with equivalent pay, benefits and other conditions of employment.

*Id*. § 2614(a)(1).  However, a restored employee is not entitled to "any right, benefit, or position of

employment other than any right, benefit, or position to which the employee would have been entitled had

the employee not taken the leave."  *Id*. at 2614(a)(3); *see also* C.F.R. § 825.216(a) ("An employee has no

greater right to reinstatement or to other benefits and conditions of employment than if the employee had

been continuously employed during the FMLA leave period.").  "Taking FMLA leave does not insulate an

employee from being fired for other reasons."  *Dry v. The Boeing Co.*, 92 Fed. Appx. 675, 677-78 (10th

Cir. 2004) (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)).

Plaintiff claims that defendant interfered with her exercise of her FMLA rights and retaliated against her for taking FMLA leave.  The Tenth Circuit, in *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002), identified § 2615(a)(1) as the "interference/entitlement theory" and § 2615(a)(2) as the "retaliation/discrimination theory."  The Tenth Circuit noted:

> The interference or entitlement theory is derived from the FMLA's creation of substantive rights.  If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent.  In such a case, "the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave . . . . [T]he intent of the employer is immaterial."  However, we are also mindful that "[u]nder FMLA, an employee who requests leave or is on leave has no greater rights than an employee who remains at work."

*Smith*, 298 F.3d at 960-61 (internal citations omitted).

### 1.    Interference

To establish a prima facie claim for FMLA interference, plaintiff must show: "(1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with h[er] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of h[er] FMLA rights." *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1319 (10th Cir. 2005) (citing *Bones v. Honeywell Int'l. Inc.*, 366 F.3d 869, 877 (10th Cir. 2004)).  In support of her interference claim, plaintiff contends that defendant issued her discipline for taking leave, failed to reinstate her to the same or substantially similar position once her leave ended, and terminated her employment – which plaintiff claims was motivated in part by her notification that she was taking FMLA leave and in part because plaintiff's leave left the Atchison clinic "in disarray."

In this case, plaintiff applied for and was permitted to take FMLA leave from October 13, 2003, through January 4, 2004, exactly twelve weeks.  Plaintiff successfully took the entirety of her FMLA leave

and did not experience any adverse employment decision until after her leave ended. At the conclusion of her FMLA leave, plaintiff returned to her position as a PCT II with the same pay and benefits, but with reduced work hours because of the low patient census at the Atchison clinic. It is undisputed that both plaintiff and Jackson, the other PCT at the Atchison clinic, were working reduced hours in January 2004 because of the reduced patient census. Moreover, both plaintiff and Jackson had been working reduced hours prior to plaintiff's FMLA leave, since at least August 2003, due to the low patient census and because neither PCT took advantage of defendant's offer to supplement their hours by working at other clinics.

The only difference in plaintiff's job duties upon her return from FMLA leave was that defendant removed her unit secretary and inventory technician duties as a result of the problems that it had discovered with her performance of those duties while plaintiff was on FMLA leave. Thus, plaintiff was reinstated to her PCT II position, at the same rate of hourly pay, without having to perform the additional duties as unit secretary and inventory technician that she previously performed for the same amount of hourly pay before her leave. Plaintiff's hours would have remained reduced even if she had not gone on leave because of the low patient census. There is no evidence that defendant set about reducing PCT hours at the Atchison clinic in August 2003 in anticipation of plaintiff's FMLA leave later that year, or that defendant continued to cut PCT hours at the Atchison clinic because plaintiff took FMLA leave. Moreover, defendant would have removed plaintiff's unit secretary and inventory technician duties even if she had not gone on leave, once it discovered the problems with her performance of those duties.

It is undisputed that Dwyer issued plaintiff a corrective action form immediately upon plaintiff's return from leave, on which Dwyer recited several frustrations with plaintiff surrounding the circumstances of her absence on October 13, 2003, including plaintiff's failure to properly notify a center director of her intent

-21-

to be absent beginning on October 13, 2003.  The corrective action form also stated problems that plaintiff's unexpected leave created with coverage of the unit secretary and inventory technician duties, especially because Dwyer was out of the office.  While Dwyer expressed frustration with the circumstances surrounding plaintiff's leave, Dwyer also testified that she did not think it was wrong for plaintiff to take FMLA leave to have back surgery even though Dwyer was away from the clinic at that time.  The result of the corrective action was that plaintiff would no longer be handling inventory or billing duties – which apparently had been decided by Pedrick in light of the problems discovered while plaintiff was on leave.  Plaintiff had no greater rights or entitlement to benefits because she took FMLA leave, and her employment could have been terminated for reasons not related to her FMLA leave.  *See* 29 U.S.C. § 2614(a)(3); C.F.R. § 825.216(a); *Dry*, 92 Fed. Appx. at 677-78; *Smith*, 298 F.3d at 960, *Gunnell*, 152 F.3d at 1262.  Plaintiff was bound to abide by defendant's policies for notifying a center director of her October 13, 2003 absence – even if the absence was FMLA-protected.  *Bones*, 366 F.3d at 878 (holding that plaintiff's request for FMLA leave did not shelter her from the obligation, which was the same as that of any other employee, to comply with defendant's employment policies, including defendant's absence policy).

In this case, plaintiff took an unencumbered twelve weeks of FMLA leave.  Defendant took actions regarding plaintiff's employment, such as reducing her PCT hours due to patient census, which occurred well before plaintiff ever went on leave, and removing her inventory technician and unit secretary duties, that were unrelated to plaintiff's FMLA leave.  Defendant also issued plaintiff the January 5, 2004 corrective action as a result of her failure to notify a center director of her October 13, 2003 absence in accordance with defendant's absence policy.  However, defendant's January 5, 2004 corrective action form did not alter or reduce plaintiff's pay, benefits, or her duties as a PCT.  Accordingly, even viewing the facts in a light most

-22-

favorable to plaintiff, the only truly adverse action that plaintiff experienced upon her return from FMLA leave, that also creates the appearance of being casually related to plaintiff's FMLA leave, was the end of plaintiff's employment on January 16, 2004.

The essence of plaintiff's FMLA claims is that defendant terminated her employment within a few weeks following her return from leave, which plaintiff claims was motivated in part by her taking FMLA leave.  In this circumstance, plaintiff's claims are more properly analyzed as a single retaliation claim – not as separate interference and retaliation claims.  *See Metzler v. Fed. Home Loan Bank of Topeka*, 2004 WL 2413594, at *7 (D. Kan. Sept. 21, 2004) (finding that where plaintiff claims the real reason for her termination is her exercise of her FMLA rights, it is a claim that defendant offered a pretextual reason for plaintiff's termination, which is a "classic retaliation claim"); *Dressler v. Comm. Serv. Comms., Inc.*, 275 F. Supp. 2d 17, 23-4 (D. Me. 2003) (finding that plaintiff's claim of interference with a right to restoration was really a retaliation claim when defendant provided plaintiff with all the leave he had requested and plaintiff claimed that he was not restored to his position because he took FMLA leave); *see also Alifano v. Merck & Co.*, 175 F. Supp. 2d 792, 797 (E.D. Pa. 2001) (finding that plaintiff could not prove she was discouraged from taking FMLA leave because it was undisputed that she took leave).

The crucial difference in the analysis of these two claims is that the intent of the employer is relevant in a retaliation context, whereas the employer's intent makes no difference if plaintiff has established a prima facie interference claim.  *See Smith*, 298 F.3d at 960; *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999); *see also Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160(1st Cir. 1998) ("[Plaintiff] claims that his termination violated the FMLA because it was prompted by the fact that he took sick leave to which he was entitled under the statute.  In such a case, the employer's motive is relevant, and

the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason."); *Dressler*, 275 F. Supp. 2d at 24-5 (noting that the "firing-is-a-denial-of-restoration-argument is simply a clever way of trying to shortcut" plaintiff's burden of persuasion). Because the court finds defendant's motive in eliminating plaintiff's PCT position relevant to an analysis of plaintiff's claims, the court turns to plaintiff's retaliation claim.

### 2.        Retaliation Claim

#### a.        Prima Facie Case

Plaintiff must demonstrate that: "(1) [s]he availed h[er]self of a protected right under the FMLA, (2) an employment decision adversely affected h[er], and (3) a causal connection between the two actions exists" in order to establish a prima facie case for FMLA retaliation. *Buettner v. N. Okla. County Mental Health Ctr.*, 2005 WL 3164698, at *4 (10th Cir. Nov. 29, 2005) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (10th Cir. 1997)). When evaluating a retaliation claim under the FMLA, the court must first determine whether the plaintiff has presented direct evidence of retaliatory intent. *Morgan*, 108 F.3d at 1323 n.3. If no direct evidence of retaliatory intent is presented, this court must apply the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208-9 (10th Cir. 1997). Under the *McDonnell Douglas* framework, defendant has an opportunity to rebut a prima facie case of retaliation by offering legitimate, nonretaliatory reasons for the adverse action. *Id*. Once defendant proffers such reasons, plaintiff must present evidence that defendant's reasons are unworthy of belief, or are pretextual. Plaintiff has the ultimate burden of demonstrating that the challenged employment decision was the result of intentional retaliation. *See Gunnell*, 152 F.3d at 1263.

Plaintiff contends that there is direct evidence of retaliatory intent in this case.  Plaintiff contends that defendant intended to terminate plaintiff's employment and that this was motivated at least in part by plaintiff taking FMLA leave which is demonstrated by: (1) e-mails between Pedrick and Dwyer that show that Dwyer was angry at plaintiff for taking FMLA leave while Dwyer was on vacation; (2) the January 5, 2004 corrective action form states that the only problem was plaintiff's taking leave[13]; and (3) Pedrick's January 9, 2004 memorandum to plaintiff, which stated that part of the reason defendant was taking the action was due to the manner in which she initiated her absence.  The court finds that the purportedly direct evidence to which plaintiff points is better characterized as evidence that tends to show defendant's motives and is more appropriately addressed under the pretext prong of the *McDonnell Douglas* burden-shifting framework.

The parties agree that plaintiff meets the first element of her prima facie case.  Defendant contends that, even if its actions toward plaintiff after her return from leave ended constituted an adverse employment action, plaintiff cannot establish a causal connection between her leave and the adverse action.  The court disagrees, based on the proximity between plaintiff's return from FMLA leave on January 5, 2004, and the January 9, 2004 meeting between plaintiff, Dwyer and Pedrick, during which Pedrick told plaintiff that her position at the Atchison clinic was being eliminated and that she could either apply for a transfer or resign her employment; if she chose neither, her employment would be terminated by the end of January.  The Tenth Circuit has determined that "[t]he burden of establishing a prima facie case is not onerous.  It is because of this relatively lax burden that we allow temporal proximity between a protected activity and an adverse action to establish a prima facie case . . . ."  *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir.

---

[13] While the court, based on the record before it, disagrees with plaintiff's characterization of this piece of evidence, the court will address plaintiff's arguments in the pretext section of this analysis.

2004) (internal citations omitted).  Accordingly, the court finds that plaintiff has established her prima facie case for retaliation.

### b.      Legitimate, Nonretaliatory Reason

Defendant contends that it has set forth legitimate, nonretaliatory reasons for its actions toward plaintiff following her return from leave.  Defendant contends that it eliminated plaintiff's position because of the low patient census at the Atchison clinic and that plaintiff was the proper choice for job elimination based on the recent discoveries about her performance of her unit secretary and inventory technician positions.  In any case, defendant contends that it had grounds on which to terminate plaintiff because of her deficient performance of her inventory technician duties that was discovered during her leave.  Instead of terminating plaintiff once she returned from leave, defendant gave plaintiff an opportunity to explain her performance deficiencies and offered her the opportunity to transfer to another clinic or resign her employment.  The court finds that defendant has met its "exceedingly light burden" of offering a nonretaliatory reason for its actions. *See Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002).

### c.      Pretext

At this point, plaintiff may avoid summary judgment only by presenting evidence that defendant's reasons for its decision following her return from FMLA leave are pretextual (unworthy of belief) or by introducing evidence of a retaliatory motive. *See Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).  Plaintiff may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan*, 108 F.3d at 1323 (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)).  However, plaintiff's

-26-

"mere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988). "The relevant inquiry is not whether defendant's reasons for its . . . decisions were 'wise, fair or correct,' but whether defendant . . . 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Kaster v. Safeco Ins. Co. of Am.*, 212 F. Supp. 2d 1264, 1274 (D. Kan. 2002) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)); *see also Exum v. United States Olympic Comm.*, 389 F.3d 1130, 1137-38 (10th Cir. 2004).

Defendant contends that plaintiff cannot establish pretext in this case. Defendant contends that Pedrick and defendant made a justified decision to relieve plaintiff of her unit secretary and inventory technician duties following the discoveries made while she was on leave. Pedrick also made the decision to eliminate the PCT position at the Atchison clinic, and that position has not been re-filled. Because of plaintiff's performance deficiencies that were discovered while she was on leave, even though those deficiencies were not related to plaintiff's performance of her PCT duties, defendant determined that it would be plaintiff's position that was eliminated. Defendant contends that, instead of terminating plaintiff's employment once she returned from leave, it gave her an opportunity to transfer or voluntarily resign her employment and that plaintiff failed to take advantage of these alternatives. Defendant contends that Pedrick was the actual decision-maker and that he honestly believed that plaintiff's performance was deficient and that the Atchison clinic had to eliminate a PCT position in order to remain open. Defendant urges the court to review the facts as they appeared to Pedrick, the decision-maker, and not to sit as a "super-personnel department" and second-guess defendant's business judgment in the actions it took toward plaintiff.

Plaintiff contends that she has established pretext through: (1) the fact that the alleged adverse actions against plaintiff began immediately following her return from FMLA leave on January 5, 2004 (issuance of the corrective action, alteration of plaintiff's job duties, responsibilities and hours of employment, the notice that plaintiff's position was being eliminated, and ultimately her termination eleven days later on January 16, 2004); (2) the alleged adverse actions themselves; (3) defendant's treatment of plaintiff prior to October 2003 compared to her treatment upon her return from FMLA leave; (4) defendant's alleged violation of its own attendance, corrective action, FMLA, severance, and transfer policies; and (5) the allegedly suspect explanations that defendant gave for the actions it took with regard to plaintiff after her FMLA leave (such as Dwyer being angry at plaintiff for taking FMLA leave while she was on vacation, but then stating that she issued plaintiff a corrective action form to help save plaintiff's job; defendant offering plaintiff the option to transfer or take a severance package when plaintiff believed she was prohibited from doing so by defendant's policies).

First, plaintiff's temporal proximity argument, while sufficient to establish her prima facie case, does not by itself establish pretext. As the Tenth Circuit has stated:

> The burden of establishing a prima facie case is not onerous. It is because of this relatively lax burden that we allow temporal proximity between a protected activity and the adverse action to establish a prima facie case; for the same reason we have not imported this lessened standard to pretext analysis where the burden is more demanding and requires a plaintiff to assume "the normal burden of any plaintiff to prove his or her case at trial."

*Annett*, 371 F.3d at 1241 (internal citations omitted).

Second, the fact that defendant issued plaintiff a corrective action form upon her return from FMLA leave, reduced her hours, removed her unit secretary and inventory technician duties, and eliminated her position soon after her leave ended do little to support plaintiff's argument that her termination was based, in

-28-

part, on her taking of FMLA leave.  As the facts demonstrate, defendant issued plaintiff the January 5, 2004 corrective action for her failure to properly notify defendant of her intent to take leave under its policies. Even if plaintiff relied on defendant's local call-in policy for the Atchison clinic, she has admitted that she should have contacted the other PCT and notified the center director prior to her absence.  It is undisputed that she did not contact Dwyer, who was on vacation.  The record further reflects that, although plaintiff notified Thompson, the acting center director, of her absence at some point, there is no evidence that Thompson was notified of her absence prior to the start of plaintiff's shift on October 13, 2003, which violated defendant's policy.  As the court has previously noted, plaintiff was bound to abide by defendant's policies for notifying a center director of her October 13, 2003 absence – even if the absence was FMLA-protected.  *Bones*, 366 F.3d at 878.

Moreover, even though the corrective action form that Dwyer drafted expresses Dwyer's frustration with plaintiff taking unexpected leave, it is uncontroverted that Pedrick was the one who decided to remove plaintiff's unit secretary and inventory technician duties as a result of the discoveries that were made about plaintiff's poor performance of those duties while she was on leave.  Again, plaintiff was entitled to no greater protection from discipline or termination for non-FMLA-related reasons than if she had been working during the time she was on leave.  *See* 29 U.S.C. § 2614(a)(3); C.F.R. § 825.216(a); *Dry*, 92 Fed. Appx. at 677-78; *Smith*, 298 F.3d at 960; *Gunnell*, 152 F.3d at 1262.

The fact that defendant removed plaintiff's unit secretary and inventory technician duties upon her return from leave, in light of the fact that plaintiff remained a PCT II and was paid at the rate of PCT II, even though defendant did ask plaintiff to spend some time explaining the missing inventory items and catching up on some filing upon her return, do not amount to a failure to reinstate plaintiff to her position as a PCT II.

Moreover, despite plaintiff's claim that defendant reduced her hours once she returned from leave, the record reflects that the reduction in hours at that point was minimal (from 23.17 hours the week before plaintiff went on leave to 21 hours per week upon plaintiff's return). Both plaintiff's and Jackson's hours were reduced well before plaintiff went on FMLA leave, and that reduction continued once plaintiff returned from FMLA leave because the patient census had not improved.

Pedrick has testified, and his January 9, 2004 memorandum to plaintiff stating her options for working with defendant make clear, that defendant's human resources department recommended that plaintiff's employment be terminated based solely on the discovery regarding her performance of her unit secretary and inventory technician duties. Instead, Pedrick chose to offer plaintiff an opportunity to apply for a transfer or to take a severance package. All of these decisions were set in the framework of the low patient census at the Atchison clinic, and the fact that PCT hours had been reduced since before plaintiff went on leave. Defendant's ultimate decision that only one PCT would remain at the Atchison clinic appears to have nothing to do with the fact that plaintiff took FMLA leave, but rather on defendant's business considerations of which plaintiff was aware prior to her FMLA leave, which was permissible. *See Dry*, 92 Fed. Appx. at 677-78; *Smith*, 298 F.3d at 960; *Gunnell*, 152 F.3d at 1262. Further, the fact that defendant/Pedrick chose to eliminate plaintiff's position instead of Jackson's was based on plaintiff's deficiencies in the performance of her unit secretary and inventory technician duties and the undisputed fact that Jackson was a more experienced PCT than plaintiff. Notably, plaintiff did nothing to explore the possibility of a transfer and declined the severance package without asking any questions about whether those were real options for her based on her understanding of defendant's corrective action, transfer and

-30-

severance policies. Thus, even viewing each of plaintiff's claimed adverse actions individually and in the aggregate, they are simply insufficient to establish pretext under these facts.

Third, the court finds little support for plaintiff's allegation that defendant's treatment of plaintiff prior to October 2003 compared to her treatment upon her return from FMLA leave supports her pretext argument. As the court has thoroughly discussed above, defendant made discoveries during plaintiff's FMLA leave regarding deficiencies in her performance that led to a change in her duties following her FMLA leave. Plaintiff's deficiencies, in defendant's view, violated defendant's policies. Prior to plaintiff being on leave and other defendant employees handling her unit secretary and inventory technician duties, defendant was unaware of the extent of the problems with plaintiff's performance in those areas. "Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Metzler*, 2004 WL 2413594, at *11 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992)). Moreover, defendant never questioned plaintiff's skill or work in her PCT duties. However, when presented with the need to eliminate a PCT position, Pedrick chose plaintiff based on the problems with her performance in her other duties and the fact that Jackson had more seniority as a PCT. Plaintiff's argument on this issue fails to establish pretext for retaliation.

Fourth, plaintiff's argument that defendant violated its own attendance, corrective action, FMLA, severance, and transfer policies fails to establish pretext for retaliation. The record does not establish that defendant violated its attendance, corrective action or FMLA policies. The court does not find it necessary to repeat its discussion of defendant's application of these policies to plaintiff. Further, with regard to plaintiff's contention that defendant violated its severance and transfer policies, defendant has acknowledged

-31-

that it made an exception to those policies for plaintiff's benefit so that she could apply for a transfer or receive severance.  Defendant told plaintiff in the January 9, 2004 meeting and in the January 9, 2004 memorandum that she could apply for a transfer or receive severance if she signed a waiver of her rights.  Plaintiff never asked whether she would be permitted to exercise either option in light of defendant's policies.  Defendant's willingness to make an exception to its policies for plaintiff's benefit does not amount to pretext for retaliation.  Rather, it appears that defendant, through Pedrick's advocacy, was trying to provide plaintiff with alternatives in light of the pending elimination of her position.

Finally, the allegedly suspect explanations that defendant gave for the actions it took with regard to plaintiff after her FMLA leave (such as Dwyer being angry at plaintiff for taking FMLA leave while she was on vacation, but then stating that she issued plaintiff a corrective action form to help save plaintiff's job, and defendant offering plaintiff the option to transfer or take a severance package when plaintiff believed she was prohibited from doing so by defendant's policies) do nothing to further plaintiff's pretext claim.

While the record is clear that Dwyer was frustrated with plaintiff for taking leave while Dwyer was on vacation, Dwyer testified that she did not think it was wrong for plaintiff to take FMLA leave in October 2003 to have her back surgery.  Moreover, while the court is unclear how Dwyer issuing the corrective action form would have saved plaintiff's job, which ultimately it did not, it is irrelevant in light of the entire rest of the record.  Dwyer, Pedrick and human resources discussed the need for the corrective action form before Dwyer issued it, as a result of plaintiff's failure to properly notify a center director of her absence on October 13, 2003.  Although neither Pedrick nor a human resources representative reviewed the form that Dwyer prepared before she gave it to plaintiff, the only result of the corrective action form was that some of plaintiff's duties were removed, but it did not affect her PCT position or her rate of pay.  Moreover, Dwyer

-32-

was not the ultimate decision-maker with regard to the removal of plaintiff's unit secretary and inventory technician duties or the elimination of plaintiff's position.  Further, as the court fully discussed above, the fact that defendant offered plaintiff the option to transfer or take a severance package, which was an exception to defendant's policies on those issues, does not create an inference of pretext for retaliation.

In sum, the record before the court fails to establish that defendant's reasons for its actions toward plaintiff following her return from FMLA leave are unworthy of belief, and plaintiff has failed to provide evidence of a retaliatory motive by defendant/Pedrick, who was the decision-maker on all of the allegedly adverse decisions made about plaintiff's employment.  Accordingly, the court finds that defendant is entitled to summary judgment on plaintiff's FMLA claims.

**B.      § 1981 Claim**

The court points out that § 1981 was enacted to prevent discrimination against an individual on the basis of his or her race or ethnic background. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  Accordingly, a plaintiff claiming discrimination under § 1981 must make a showing of racial animus. *Patrick v. Miller*, 953 F.2d 1240, 1250 (10th Cir. 1992).  In this case, there is simply no evidence in the record before the court that defendant acted with racial animus toward plaintiff.  In fact, the only remaining PCT at the Atchison clinic, who was also employed during plaintiff's employment, is another black female who plaintiff concedes was more experienced in the PCT position.  Because of the utter lack of evidence supporting plaintiff's race discrimination claim, defendant is entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 46) is granted.

Dated this <u>18th</u> day of January 2006, at Kansas City, Kansas.

-33-

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**